## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID PATE, JR.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 9134 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g), Plaintiff, David Pate, Jr., seeks judicial review of the final decision of Defendant, the Commissioner of Social Security Administration ("Commissioner"), who determined that Plaintiff was not entitled to Child's Insurance Benefits ("CIB") or Supplemental Security Income ("SSI"). Before this Court is Plaintiff's Motion for Summary Judgment, which requests this Court to reverse the Administrative Law Judge's ("ALJ") decision that Plaintiff was not entitled to CIB or SSI benefits and remand Plaintiff's case for further determination of his disability. The Commissioner's Motion for Summary Judgment, which requests this Court to affirm the ALJ's decision, is also before the Court. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). For the reasons set forth below, this Court grants Plaintiff's motion and reverses the ALJ's final decision and remands this case for further determination of Plaintiff's disability.

# I. **Procedural History**

On September 14, 2001, Plaintiff applied for CIB and SSI under Titles II and XVI of the Social Security Act, respectively, 42 U.S.C. §§ 402(d), 1381a. (R. at 74, 216.) Plaintiff alleged that he became disabled at age sixteen due to a seizure disorder. (R. at 97-98, 223.) Plaintiff's claims were denied initially and on reconsideration. (R. at 53-60, 61-66, 219-28.) On February 20, 2002, Plaintiff requested a hearing before an ALJ. (R. at 67.) The hearing was held before ALJ John L. Mondi, on April 23, 2003, where Plaintiff and his mother, who were represented by counsel, testified. (R. at 35-52.) After the hearing Plaintiff submitted additional evidence. (R. at 206-15.) On June 26, 2003, the ALJ rendered his decision and found Plaintiff not disabled at step five of his five-step inquiry. (R. at 18-19.) On October 16, 2003, the ALJ's decision became the Commissioner's final decision when the Social Security Administration Appeals Council denied Plaintiff's request for review. (R. at 6-10.)

# II. **Background Facts**

## A. **Plaintiff's Background**

Plaintiff was born on December 19, 1983, (R. at 88), and was nineteen years old on the date of the ALJ's decision. (R. at 19.) Plaintiff received formal education through tenth grade. (R. at 37.) Plaintiff's work experience is minimal, as he held only two or three jobs for one or two months each. (R. at 18, 38-41.)

## B.    Medical Evidence

On March 9, 2000, Plaintiff went to the emergency room at Loyola University's hospital complaining of spasms in his arms and legs. (R. at 126, 135.) Notes from Dr. Kenneth Silver, M.D., include Plaintiff's statement that he had been experiencing spasms in the morning for about two months prior to March 9, 2000. (R. at 126.) Plaintiff explained that, while the spasms themselves did not cause him pain, spasms in his legs occasionally caused him to fall and bang his chin or cut his lip. (Id.) Plaintiff was ultimately diagnosed with hypocalcemia, seizures, and a heart murmur, and was admitted to the hospital. (R. at 134.) An electroencephalogram ("EEG") was administered and the results were normal. (Id.) On March 13, 2000, Plaintiff was discharged with instructions to follow up with Dr. W. Patrick Zeller, M.D., a pediatric endocrinologist. (R. at 133.)

Dr. Zeller's treatment notes from April 2000 to December 2000 show that Plaintiff was prescribed Trileptal for his shaking and muscle spasms. (R. at 150-54.) Dr. Zeller's later notes reveal that Plaintiff did not always comply with his medical prescriptions. (R. at 150-51.) In addition to the Trileptal, Dr. Zeller also increased Plaintiff's vitamin D intake, as Plaintiff was vitamin D deficient. (Id.)

On November 19, 2000, Plaintiff went to the emergency room at Loyola University's hospital after having a seizure that morning. (R. at 146.) The Emergency Department Physician Record states that Plaintiff had experienced a generalized tonic-clonic seizure (grand mal seizure) that had lasted about five minutes. (R. at 147.) Plaintiff underwent a neurological examination and an EKG examination, both of which were normal. (R. at 146.) Emergency Department records also indicate that Plaintiff had recently undergone a head MRI and the results

- 3 -

were normal. (Id.) Plaintiff was discharged with instructions to follow up with neurology and endocrinology doctors, namely Drs. Zeller and Silver. (Id.)

Treatment notes from Dr. Michael Schwabe, M.D., a pediatric neurologist, from April 2001 to September 2001 showed that Plaintiff was diagnosed with cryptogenic localization-related epilepsy with tonic, myoclonic, and secondary generalized seizures. (R. at 167-70, 213-15.) Plaintiff was again prescribed Trileptal, which he tolerated with no side effects. (Id.) These notes include Plaintiff's complaints of spasms, shakiness, and falls occurring multiple times per week. (R. at 167-69.)

On July 4, 2001, Plaintiff went to the emergency room at Loyola University's hospital after having a seizure that lasted approximately seven minutes. (R. at 166.) It was reported that Plaintiff's last grand mal seizure was in November 2000. (R. at 163.) Plaintiff was taking Trileptal at the time, but the report indicates that Plaintiff had not been compliant with his medication. (Id.) The report further indicates that Plaintiff complained of his legs giving out on him between one and three times per week, (id.), and that Plaintiff could not recall the events surrounding that day's seizure. (Id.) Plaintiff was instructed to take Trileptal and follow up with a neurologist. (R. at 164.)

On follow up, Dr. Schwabe believed that Plaintiff's grand mal seizure may have been related to sleep deprivation. (R. at 168.) Plaintiff continued on Trileptal. (R. at 213-14.) As noted above, Dr. Schwabe continued to report multiple incidents of minor seizures and falling, especially in the morning, up until September 2001. (R. at 167-68, 214.)

On October 1, 2001, Dr. Chantal Lutfallah, M.D., a pediatric endocrinologist with the Bureau of Disability Determination Services ("DDS"), met with Plaintiff. Dr. Lutfallah's report

- 4 -

states that Plaintiff was diagnosed with Rickets vitamin D deficiency and that Plaintiff presented with seizures due to the vitamin D deficiency. (R. at 174.) Plaintiff was prescribed medication and his levels were back to normal. (Id.) Plaintiff had one seizure since the medication was discontinued. (Id.) An EEG revealed epileptiform changes, for which Plaintiff was seeing a neurologist. (Id.)

On November 5, 2001, state-agency physicians reviewed the record. (R. at 190.) The physicians found that Plaintiff has a seizure disorder but that Plaintiff's only grand mal seizure was in November 2000. (Id.) The physicians noted that Plaintiff has had tonic-clonic seizures associated with Rickets vitamin D deficiency but since taking medication his levels are back to normal. (Id.) Furthermore, according to Plaintiff's doctor, Plaintiff has had only one seizure since the medication was discontinued. (Id.) The physicians also noted Plaintiff's history of non-compliance. (Id.) Finally, the physicians opined that Plaintiff had no exertional limitations but could not climb ladders, ropes, or scaffolds and needed to avoid concentrated exposure to hazards. (R. at 183-90.)

Dr. Schwabe's treatment notes from August 2002 to November 2002 showed that Plaintiff was taking Keppra and Zonegran. (R. at 208-12.) Plaintiff reported having a generalized tonic-clonic seizure on July 3, 2002. (R. at 211.) Plaintiff reported having another generalized tonic-clonic seizure on September 22, 2002. (R. at 210.) Plaintiff reported doing better with an increase in Zonegran. (R. at 208-09.) Plaintiff tolerated his medications with no side effects. (R. at 209.) However, Dr. Schwabe noted on several occasions that Plaintiff's seizures are medically intractable. (R. at 208-10.)

In early 2003, Dr. Roy Sucholeiki, M.D., replaced Dr. Schwabe as Plaintiff's treating neurologist. On April 22, 2003, Dr. Sucholeiki completed a Seizures Residual Functional Capacity Questionnaire ("Seizures Questionnaire"). (R. at 202-05.) Dr. Sucholeiki diagnosed Plaintiff with cryptogenic epilepsy and myoclonic/tonic seizures, and generalized tonic-clonic seizures. (R. at 202.) Dr. Sucholeiki appears to describe the frequency of the seizures as historically occurring between once or twice a week and once every other month. (Id.) Dr. Sucholeiki then answered the follow up question, "What are the dates of the last three seizures?" by writing "9/22/02" two times. (Id.) In answering the rest of the questionnaire, Dr. Sucholeiki suggested that Plaintiff's seizures occur primarily in the morning, Plaintiff loses consciousness because of his seizures, and Plaintiff has no warning of an impending seizure. (R. at 202-03.) Dr. Sucholeiki further opined that lack of sleep and increased stress are precipitating factors of Plaintiff's seizures. (R. at 203.) Because stress might trigger Plaintiff's seizures, Dr. Sucholeiki believed that Plaintiff could best tolerate low stress jobs. (R. at 205.) Dr. Sucholeiki suggested that Plaintiff may be injured during his seizures and that Plaintiff's seizures may be disruptive and otherwise impair Plaintiff's ability to work. (R. at 204.) Dr. Sucholeiki believed that Plaintiff's seizure disorder would cause him to miss work. (R. at 205.) Dr. Sucholeiki also indicated that, given the fact that Plaintiff suffers seizures and may fall or suffer muscle spasms, Plaintiff has limited ability to work at heights, with heavy machinery, or extreme heat, and limited ability to carry, lift, or stand at work. (Id.) Dr. Sucholeiki believed that Plaintiff should work sitting down and should not perform work over his cognition level. (Id.) Finally, Dr. Sucholeiki believed that Plaintiff's seizures caused Plaintiff to be depressed, socially isolated, suffer memory problems, and have poor self-esteem. (R. at 204.)

- 6 -

## C.     Plaintiff's Testimony

At his ALJ hearing, Plaintiff testified that he was nineteen years old, had never married, had no children, and dropped out of high school during eleventh grade. (R. at 37.) Plaintiff testified that he had no problems reading or writing. (R. at 37-38.) Plaintiff lives at home with his father, mother and brother. (R. at 42-43.) Plaintiff does not have a driver's license and never applied for one. (R. at 43.) Plaintiff walks for exercise, hangs out with friends, and goes to church. (Id.) Plaintiff claims he cannot visit his friends too often because of his seizures condition. (Id.)

When asked about his work experience, Plaintiff explained that he worked part time (approximately twenty hours per week) at a Jewel supermarket from March 2000 until April 2000. (R. at 38-39.) Plaintiff testified that he left that job because of his seizures. (R. at 39.) Next, Plaintiff worked at a car wash for about one week in 2001, before leaving the job due to his tonic seizures. (R. at 41.) Plaintiff's next and last job was a part time position with Park and Recreation Services in September 2002. (R. at 39-40.) Plaintiff left that job after a few weeks when he suffered to two grand mal seizures on September 22, 2002. (R. at 40.) Plaintiff is able to help out a little bit at home and can occasionally mow the lawn. (R. at 43.)

Plaintiff testified that he experiences two or three petite mal seizures per week. (R. at 41.) Plaintiff claimed that he experiences about two grand mal seizures per month, (R. at 42), and that it usually takes him an hour to recover from them. (Id.) Plaintiff takes Keppra and Zonegran for his seizures. (Id.) Plaintiff testified that he has been taking these drugs for about two years and that he does not forget to take them. (Id.) Plaintiff said the drugs have side effects

- 7 -

such as confusion, heart flutters and lack of sleep. (Id.) Plaintiff explained that Dr. Sucholeiki replaced Dr. Schwabe as Plaintiff's treating neurologist. (Id.)

### D.    Plaintiff's Mother's Testimony

Plaintiff's mother, Bertha Pate, testified at the ALJ hearing. Mrs. Pate testified that Plaintiff's seizures prevent him from working and that Plaintiff may require between four and six hours of sleep after a seizure. (R. at 44.) Mrs. Pate testified that Plaintiff usually does not remember what happened after a seizure. (Id.) Mrs. Pate claimed that Plaintiff suffers a grand mal seizure every two months or so. (Id.) Plaintiff's last grand mal seizures were in September 2002. (R. at 48.) Mrs. Pate described Plaintiff's last grand mal seizure. She explained that Plaintiff shook and jerked and perspired. (R. at 47.) Plaintiff's eyes rolled back to the top of his head and he fell on the floor and lost consciousness. (Id.) While unconscious, Plaintiff continued to shake all over and saliva came out of his mouth. (R. at 47-48.) Plaintiff did not remember what happened when it was over. (R. at 48.) Mrs. Pate claimed that it took Plaintiff about four hours to recover from that seizure. (Id.) During this incident, Plaintiff was taken to the emergency room at Loyola University. (Id.) The hospital ran several tests on Plaintiff and the results were all normal. (Id.) Plaintiff then suffered a second, longer grand mal seizure while in the emergency room. (R. at 49.) After this incident, Plaintiff's dosage of Keppra was increased. (Id.) Since then, Plaintiff has not suffered another grand mal seizure. (Id.)

According to Mrs. Pate, Plaintiff's medication has been effective in bringing the grand mal seizures under control, but not the petite mals, which are responsible for plaintiff's shaking, muscle spasms, and jerks. (R. at 44-45.)

Mrs. Pate testified that Plaintiff continues to experience about four of the petite mals per week. The petite mals tend to last about a minute and often cause Plaintiff to fall. (R. at 45, 49.) The petite mals can happen at anytime and they leave Plaintiff dazed and often sitting on the floor. (R. at 49.) Plaintiff requires about an hour to recover after the petite mals. (Id.) Plaintiff takes his medications regularly. (R. at 45.) And Mrs. Pate testified that it is the petite mals that prevent Plaintiff from getting a job. (R. at 45-46.) According to Mrs. Pate, Plaintiff wants to work, play sports and drive but he cannot do these things with out suffering petite mals and falling down and suffering muscle spasms. (Id.)

Mrs. Pate testified that Plaintiff receives all of his medical attention at Loyola. (R. at 46.) Mrs. Pate takes Plaintiff to Loyola every two or three months. (Id.) According to Mrs. Pate, Plaintiff has been seeing Dr. Sucholeiki for his seizures since January 2003. (Id.)

## III.   ALJ's Findings

The ALJ made the following specific findings:

1. The claimant never married, is the child of and dependent on the wage earner, Bertha Pate, and will not attain age 22 until December 19, 2005.

2. The claimant has a severe seizure disorder but not an impairment listed in, or medically equal to an impairment in Appendix 2, Subpart P, Regulations NO. 4.

- 9 -

3.   The claimant has a residual functional capacity to perform work at all exertional levels not involving exposure to unprotected elevations, dangerous moving machinery or extremes of heat.

4.   The claimant is a "younger individual" under the Act, has a 10th grade education, and lacks past relevant work.

5.   The claimant's testimony, including that as to the frequency of his seizures and compliance was not credible.

6.   Considering the wide range of work claimant is functionally capable of performing in combination with his age, education and work experience, the record is persuasive that he can adjust to work which exists in significant numbers in the economy and, accordingly, is not disabled using Section 204.00 as a framework for decision making.

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision.

## IV.  Discussion

Plaintiff applied for CIB, based on his mother's earnings records, and adult SSI. Section 202(d)(1) of the Social Security Act provides for the payment of CIB to a person who is a child of a wage earner entitled to old-age or disability benefits, if such child was unmarried and dependent upon the wage earner at the time the application was filed, and is under a disability which began prior to age twenty-two. 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350.

In order to qualify for CIB or SSI payments an individual must meet the statutory standard for disability, which requires the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The statutes further define "inability to engage in any substantial gainful activity" as, not only unable to do his previous work but, unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The determination of disability involves a five-step process that considers both medical and vocational factors. The five steps are:

Step 1: Is the claimant engaged in substantial gainful work activity? If yes, the claimant is not disabled. If no, the inquiry proceeds to step two.

Step 2: Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months? If no, the claimant is not disabled. If yes, the inquiry proceeds to step three.

Step 3: Does the claimant's severe impairment meet or equal the severity of an impairment listed in the appendix of 20 C.F.R. § 404, Subpt. P, App. 1? If no, the claimant is not disabled. If yes, the inquiry proceeds to step four.

Step 4: Can the claimant still perform past relevant work? If yes, the claimant is not disabled. If no, the inquiry proceeds to step five.

Step 5: Can the claimant make an adjustment and perform other work? If yes, the claimant is not disabled. If no, the claimant will be found disabled.

*See Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994); 20 C.F.R. § 404.1520(a)(4)(i)-(v). At the fourth and fifth steps of the five-step inquiry, the ALJ must consider an assessment of Plaintiff's residual functional capacity ("RFC"). The RFC is an assessment based upon all of the relevant evidence of what Plaintiff can still do despite his limitations. 20 C.F.R. § 404.1545(a). In other words, the RFC is the most Plaintiff can do, not the least. Id. The RFC assessment helps to evaluate the types of work available to an individual with particular limitations. Id. The final responsibility for deciding Plaintiff's RFC rests with the ALJ. 20 C.F.R. § 404.1527(f)(2).

Plaintiff bears the burden of proof through step four of the five-step inquiry; the burden shifts to the Commissioner at step five. *Herron*, 19 F.3d at 333 n.8. Plaintiff's burden of proof includes providing medical evidence substantiating the assertion of disability. *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994); 20 C.F.R. § 404.1512(a). If the ALJ determines that Plaintiff is not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The ALJ weighs the medical and testimonial evidence presented and, when he denies benefits, he must build a logical bridge from the evidence to his conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify, or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). The scope of this review is limited. This Court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility or substitute our own judgment for that of the Commissioner. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Rather, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Id.* Evidence is considered substantial if a reasonable person

would accept it as adequate to support the ALJ's conclusion. *Id.* Thus, if reasonable minds could

disagree on whether Plaintiff is disabled, we must affirm the ALJ's decision denying benefits.

*See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

## A.    The ALJ Denied Benefits At Step Five.

In this case, the ALJ proceeded through all five steps of the five-step inquiry and denied

Plaintiff's claim at step five. (R. at 18-19.)  At step five, the burden is on the ALJ to provide

evidence that shows the existence of other work that Plaintiff can do consistent with his RFC and

vocational profile. *Herron*, 19 F.3d at 333 n.8.  Based on the medical evidence, the ALJ

determined that Plaintiff has a RFC to perform work at all exertional levels not involving

exposure to unprotected elevations, dangerous moving machinery or extremes of heat. (R. at 18.)

Using the Medical Vocational Guidelines (Grid), 20 C.F.R. § 404, Subpt. P, App. 2, Rule 204.00,

the ALJ concluded that Plaintiff could perform a significant number of jobs in the national

economy despite his nonexertional limitations. (R. at 18.)  Furthermore, the ALJ found that,

even if Plaintiff was limited to unskilled sedentary work, Plaintiff could still perform jobs

existing in significant numbers in the national economy under the Grid, 20 C.F.R. § 404,

Subpt. P, App. 2, Rule 201.24. (R. at 18.)

Plaintiff challenges the ALJ's findings on multiple fronts.  Plaintiff contends that the ALJ

failed to carefully address the important opinions of Plaintiff's treating neurologist,

Dr. Sucholeiki, as required by Social Security Ruling ("SSR") 96-5p.[1]  (Pl.'s Br. at 6.)

---

[1]  Social Security Rulings ("SSR") do not have the force of law but are binding on all
components of the Social Security Administration. *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir.
(continued...)

- 13 -

Specifically, Plaintiff takes issue with the ALJ's failure to carefully evaluate Dr. Sucholeiki's opinions on Plaintiff's ability to tolerate stress, Plaintiff's mental ability to work, and Plaintiff's need to avoid standing and lifting at work. (Pl.'s Br. at 7-8.) Plaintiff also contends that the ALJ impermissibly reached an alternative finding, that Plaintiff can perform unskilled sedentary work, based on the Grid alone (and without consulting a Vocational Expert ("VE")). (Pl.'s Br. at 8.) Next, Plaintiff asserts that the ALJ erroneously evaluated his mental condition by failing to follow the Commissioner's special technique for assessing mental impairment and by failing to consider Plaintiff's combination of physical and mental impairments. (Pl.'s Br. at 10-12.) Plaintiff claims that the ALJ was required to order a consultative psychiatric or psychological examination after he rejected Dr. Sucholeiki's uncontradicted opinions about Plaintiff's mental health. (Pl.'s Br. at 12.) Finally, Plaintiff claims that the ALJ gave inappropriate weight to the opinions of state-agency physicians, who did not examine Plaintiff. (Pl.'s Br. at 13.)

## B.     Dr. Sucholeiki's Opinions

Dr. Sucholeiki is Plaintiff's treating physician. A treating physician's opinion is generally given more weight than other medical sources. 20 C.F.R. § 404.1527(d)(2). *See also Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998). Where the treating physician's opinion is consistent with other substantial medical evidence it is normally given controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ also considers the supportability and consistency of the treating physician's opinion and gives more weight to those opinions that are (1) supported by relevant

---

[1](...continued)
1999); 20 C.F.R. § 402.35(b)(1).

- 14 -

evidence, particularly medical signs and laboratory findings, and (2) consistent with the record as a whole. 20 C.F.R. § 404.1527(d)(3)-(4). In accordance with SSR 96-5p, adjudicators are reminded that "medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." SSR 96-5p. Additionally, SSR 96-5p points out that medical source opinions are to be based on first hand knowledge, observations and examinations performed by the medical source himself. Id. Finally, if evidence does not support conclusions of the treating source and the ALJ cannot ascertain the basis of the treating source's opinion, the ALJ must make every reasonable effort to recontact the source in order to clarify.[2] 20 C.F.R. § 404.1512(e)(1); SSR 96-5p.

---

[2] Specifically, 20 C.F.R. § 404.1512(e)(1) provides in part:

(e) Recontacting medical sources: When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source . . . .

The ALJ found that several of Dr. Sucholeiki's opinions regarding Plaintiff's exertional limitations were neither consistent with, nor supported by the record. (R. at 16-18.) Dr. Sucholeiki's opinions appear only in the Seizures Questionnaire. The record shows that Dr. Sucholeiki did not support the Seizures Questionnaire with any notes or test results that he generated as Plaintiff's treating physician. Where a treating physician does not offer supporting evidence for his opinions those opinions are given less weight. *See* 20 C.F.R. § 404.1527(d)(3)-(4). The ALJ explicitly alluded to this concept at the April 23, 2003 hearing when the Seizures Questionnaire, which Dr. Sucholeiki completed on April 22, 2003, was admitted into evidence. At the opening of the hearing, the ALJ said:

> And we'll add to the record as Exhibit 15F the seizure residual functional capacity that you brought with you to the hearing and as we discussed before we went on the record, the record will be left open for an additional 30 days so you'd have an opportunity to get the treating physicians treatment records which would provide a foundation in order to weigh the appropriate weight be given this report from that physician.

(R. at 36.) And at the close of the hearing, the ALJ said, "Then we will hold the record open so we can get those treatment records which might provide support for the assessment of the treating physician." (R. at 51.) The only supplemental records provided to the ALJ after the hearing were those of Dr. Schwabe, Plaintiff's previous treating physician. (R. at 208-15.) Significantly, those records do not diagnose or discuss stress or mental impairment. (Id.)

### 1.    Dr. Sucholeiki's opinion on stress

Dr. Sucholeiki answered questions about stress on the Seizures Questionnaire. When asked, "Are there precipitating factors [of Plaintiff's seizures] such as stress, exertion?"

Dr. Sucholeiki's response included the word "stress" with an arrow pointing up, apparently indicating high-levels of stress. (R. at 203.) And when asked, "To what degree can your patient tolerate work stress?" Dr. Sucholeiki indicated that Plaintiff is "[c]apable of low stress jobs," adding that, "[Plaintiff's] seizures can be triggered by stressful situations." (R. at 205.) In his decision, the ALJ acknowledges that, "[t]he treatment records also indicate factors affecting seizures, in addition to [medical] non-compliance, are sleep deprivation, stress and heat." (R. at 17.) This is the only reference to stress in the ALJ's decision.

Dr. Sucholeiki's opinion that stress is a precipitating factor of Plaintiff's seizures is neither consistent with, nor supported by the record. Outside of the Seizures Questionnaire, the medical record, which includes examinations by Plaintiff's former treating neurologist, Dr. Schwabe, does not mention the effects of stress on Plaintiff's seizure disorder. The other factors affecting Plaintiff's seizures, namely sleep deprivation and heat are mentioned repeatedly. Nonetheless, according to Dr. Sucholeiki stress may significantly limit Plaintiff's ability to perform work. In light of the stress-related limitations identified by Dr. Sucholeiki, the ALJ cannot simply say that, "[c]onsistent with the opinions of the reviewing state-agency physicians and Dr. Sucholeiki, the record is persuasive that claimant has the residual functional capacity for at least sedentary unskilled work . . . ." (R. at 17.) A decision that Plaintiff is not disabled and can work that does not take stress into account is inconsistent with Dr. Sucholeiki's opinion. The Seizures Questionnaire itself, as well as Dr. Sucholeiki's responses, suggest that there is a relationship between stress and seizures. Given Dr. Sucholeiki's status as treating physician, even slight inconsistencies may be significant so the ALJ was obligated to recontact Dr. Sucholeiki in order to obtain more information regarding his comments on stress. *See* SSR 96-5p. The ALJ erred

- 17 -

when he glossed over what may be an important opinion from a treating physician and, as a

result, the ALJ lacked substantial evidence when he found Plaintiff not disabled. Thus, remand

is warranted. *See Young*, 362 F.3d at 1001. On remand, the ALJ will further investigate

Dr. Sucholeiki's opinions on stress and determine whether VE testimony is necessary.

### 2. Dr. Sucholeiki's opinion on Plaintiff's mental ability to work

According to the ALJ, "Dr. Sucholeiki's report is noteworthy because it indicates that

[Plaintiff] can mentally work." (R. at 17.) Plaintiff challenges the ALJ's conclusion because

Dr. Sucholeiki reported that Plaintiff had a limited ability to tolerate stress and because

Dr. Sucholeiki stated that Plaintiff had several mental problems. (Pl.'s Br. at 7.) Plaintiff

concludes that, "Contrary to the ALJ's implication, Dr. Sucholeiki did not give [Plaintiff] a clean

bill of mental health." (Id.)

Any suggestion that Dr. Sucholeiki gave Plaintiff a clean bill of health would be a

misrepresentation of Dr. Sucholeiki's opinion. Dr. Sucholeiki explicitly notes that Plaintiff is

"[c]apable of low stress jobs." (R. at 205.) This may mean that Plaintiff can mentally work.

However, Dr. Sucholeiki clearly qualifies his capable of work opinion, and possibly the number

of jobs Plaintiff can perform, with limitations on Plaintiff's ability to tolerate stress.

Dr. Sucholeiki also indicates that Plaintiff has "associated mental problems," namely depression,

memory problems, low self-esteem, and social isolation. (R. at 16, 204.) The ALJ noted all of

these findings in his opinion but concluded that Dr. Sucholeiki is of the opinion that Plaintiff can

mentally work. (R. at 16-17.) This may be an overly broad statement and/or an unsupported

- 18 -

statement. As discussed above (stress) and below (mental problems), the ALJ will investigate the basis of Dr. Sucholeiki's opinions on remand.

### 3.    Dr. Sucholeiki's opinion on Plaintiff's other limitations

Dr. Sucholeiki indicates that Plaintiff may have difficulty working because his seizure disorder affects his ability to lift, stand, carry, and work without supervision. (R. at 205.) Plaintiff argues that these limitations are supported by the record because Plaintiff suffers from seizures and could fall or drop items at any time. (Pl.'s Br. at 8-9.)

The record does not support Dr. Sucholeiki's opinions on Plaintiff's ability to lift, stand, or carry at work. The ALJ considered the fact that Plaintiff suffers from seizures but specifically found that Plaintiff's seizure disorder did not meet or equal 20 C.F.R. § 404., Subpt. P, App. 1, medical listing 11.03, i.e., petite mal seizures due to epilepsy. (R. at 16.) Furthermore, the DDS doctors who assessed Plaintiff's disability in 2001—prior to his marked improvements due to medication—did not find any limitations on Plaintiff's ability to stand, carry or lift at work. (R. at 183-90.) Rather, the DDS doctors found that Plaintiff's impairment did not meet or equal the listings. (R. at 183-90, 192.) Finally, by all accounts, Plaintiff's medication was successfully controlling his grand mal seizures. (R. at 17, 190, 208-09.) Standing alone, the existence of Plaintiff's seizure disorder is not prima facie evidence that it is dangerous for Plaintiff to lift, stand, or carry at work.

The record may yet support other limitations, as Dr. Sucholeiki will have an opportunity to supplement his opinions on remand. As discussed above, Dr. Sucholeiki is Plaintiff's treating neurologist and his potentially significant opinions warrant further investigation.

- 19 -

Dr. Sucholeiki's opinions on Plaintiff's physical limitations are potentially significant.

Accordingly, on remand, Dr. Sucholeiki will have an opportunity to elaborate on whether

Plaintiff is capable of a "full range"[3] of sedentary work (as the ALJ suggests) and why, despite

evidence to the contrary, Plaintiff's seizure disorder prevents him from lifting, standing and

carrying at work.


## C.  Alternative Finding

Plaintiff argues that the ALJ's decision includes an unsupported alternative finding that

Plaintiff can perform sedentary work. (Pl.'s Br. at 5-6.) The Commissioner argues that the ALJ

did not make an alternative finding. The Commissioner suggests that the ALJ simply found that,

"even if Plaintiff was limited to sedentary work, per Dr. Sucholeiki's opinion, he still would not

meet the statutory definition of disability." (Def.'s Br. at 8 n.3.)

The ALJ did not make an alternative finding. The ALJ found that Plaintiff can perform

work at all exertional levels not involving exposure to unprotected elevations, dangerous moving

machinery or extremes of heat. (R. at 18.) In his decision, the ALJ also states that, because

Plaintiff's only nonexertional limitation is his seizure disorder, "[e]ven assuming that [Plaintiff]

were limited to unskilled sedentary work, he could perform jobs existing in significant numbers

in the economy and would not be disabled using Vocational Rule 201.24 as a framework for

decision making." (R. at 18.) The Court agrees with the Commissioner's interpretation of the

ALJ's statement, as the ALJ's decision suggests that Dr. Sucholeiki finds Plaintiff mentally

---

[3] A "full range" of sedentary work requires, among other things, the ability to lift up to ten pounds at a time and walk or stand for about two hours in an eight-hour day. SSR 96-9p.

capable of unskilled work, (R. at 16), and physically capable of sedentary work. (R. at 17.) Thus, it appears that the ALJ is loosely addressing concerns raised by Dr. Sucholeiki's Seizure Questionnaire in an attempt to be thorough, not making an alternative finding.

The ALJ's statement is an inaccurate representation of Dr. Sucholeiki's opinion. As discussed above, Dr. Sucholeiki's Seizure Questionnaire suggests Plaintiff suffers from a variety of impairments that may prevent Plaintiff from performing a "full range" of unskilled sedentary work. The ALJ's findings, however, were based exclusively on the Grid with no VE consultation. Findings based exclusively on the Grid are appropriate only where Plaintiff can perform a "full range" of unskilled sedentary work. SSR 96-9p. Where, as here, Dr. Sucholeiki may yet produce evidence of significant restrictions on Plaintiff's ability to tolerate stress, lift, stand, or carry at work, consulting a VE may be appropriate. *See Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986) (VE consultation required where evidence suggests that plaintiff's limitations significantly diminish employment opportunities available); SSR 96-9p. *See also* 20 C.F.R. § 201.00(h)(3) (inability to perform a "full range" of sedentary work does not equate with a finding of disabled but individualized assessment of limitations is required). Thus, on remand, the ALJ will determine whether Dr. Sucholeiki's opinions are supported by medical evidence, whether Plaintiff can perform a "full range" of unskilled sedentary work, and whether VE consultation is necessary.

### D.   Mental Assessment

On the seizure questionnaire, Dr. Sucholeiki reports that Plaintiff suffers from depression, social isolation, poor self-esteem, and memory problems. (R. at 204.) Plaintiff argues that the

ALJ did not follow the Commissioner's special technique for assessing these mental

impairments. (Pl.'s Br. at 10-13.) Plaintiff also claims that the ALJ failed to consider Plaintiff's

combination of depression and seizure disorder. (Id.) Finally, Plaintiff believes that the ALJ

erred by failing to purchase a consultative examination by psychiatrists or psychologists. (Id.)


### 1.    Commissioner's special technique

Under 20 C.F.R. § 404.1512(a), the Commissioner considers only impairments Plaintiff

says he has or about which he produces evidence. 20 C.F.R. § 404.1512(a). In this case,

Plaintiff never claimed to have mental impairments and never sought treatment for mental

impairments. (R. at 16.) Furthermore, at the hearing before the ALJ, neither Plaintiff nor his

attorney raised mental impairment issues. (R. at 33-52.) Rather, when Plaintiff's attorney asked,

"Are there any health problems besides the seizures?" Plaintiff answered "No." (R. at 41.) When

an applicant for social security benefits is represented by counsel, the ALJ is entitled to assume

that the applicant is making his strongest case for benefits. *Glenn v. Sec'y of Health and Human

Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). Nonetheless, under 20 C.F.R. § 404.1520a, even when

evidence of mental impairment arises for the first time at the ALJ level it must be assessed. *See

Shields v. Sullivan,* 801 F. Supp. 151, 158 (N.D. Ill. 1992); 20 C.F.R. § 404.1520a.

The record contains minimal evidence of mental impairment. Question twenty-nine on

the Seizures Questionnaire asks, "Does your patient have any associated mental problems?"

(R. at 204.) In response to this question, Dr. Sucholeiki indicated that Plaintiff suffers from

depression, social isolation, poor self-esteem, and memory problems. (Id.) Significantly,

Dr. Sucholeiki did not submit any notes or records of mental assessments to support his opinions.

- 22 -

*See* 20 C.F.R. § 404.1527(d)(2) (less weight where opinion is not consistent with the record); 20 C.F.R. § 404.1527(d)(3) (less weight where opinion lacks support). Furthermore, medical evidence in the record contradicts Dr. Sucholeiki's claims. For example, Plaintiff's Childhood Disability Evaluation Form states that: (1) Plaintiff has no medical evidence of cognitive problems, (2) Plaintiff can work independently, and (3) Plaintiff gets along well with others. (R. at 194-95.) Plaintiff's testimony, and that of his mother, lend some support to the depression and social isolation conclusions, (R. at 43, 45-46), although Plaintiff also testified that he socializes with and spends time with friends of both sexes. (R. at 43.)

Despite the weak evidence, the ALJ is required to apply the Commissioner's special technique. 20 C.F.R. § 404.1520a. It does not take much to put mental issues into play. Even where the claimant did not claim mental impairment, nor allege mental impairment at his hearing, where there is some evidence of mental impairment in the record the ALJ must investigate. *See Shields*, 801 F. Supp. at 158-59; 20 C.F.R. § 404.1520a. In *Shields*, after completion of the claimant's hearing, the ALJ received a treating physician's report indicating that the claimant was depressed. *Shields*, 801 F. Supp. at 158-59. Even though that claimant never complained of mental impairments and there was only one other reference to mental impairment in the record, the ALJ had not only a duty but a heightened obligation to explore the evidence and apply the commissioner's special technique. *Id.* The *Shields* court also suggested, however, that an isolated notation in a previous treating physician's records might not be enough to implicate mental impairment issue. *Id.* at 159 n.12. In our case, notations regarding Plaintiff's mental impairments were received before the ALJ's hearing but the notations are not buried in the medical records. Rather the notations appear in the most recent and conceivably the most

important report from Plaintiff's treating physician. Accordingly, the Seizures Questionnaire implicates mental impairment analysis.

Given the presence of evidence that triggered the 20 C.F.R. § 404.1520a requirements, the ALJ must evaluate Plaintiff's pertinent symptoms, signs, and laboratory findings to determine whether Plaintiff has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). The ALJ must apply the Commissioner's special technique and rate the degree of functional limitation resulting from the impairments. 20 C.F.R. § 404.1520a(b)(2). Specifically, the ALJ must rate Plaintiff's three functional areas (activities of daily living, social function, and concentration, persistence of pace) as well as Plaintiff's episodes of decompensation. 20 C.F.R. § 404.1520a(c)(4). In order to properly apply the technique, the ALJ will need more information from Dr. Sucholeiki and may need to obtain expert assessments in order to generate proper documentation on possible mental impairments. *See Stambaugh v. Sullivan*, 929 F.2d 292, 296 (7th Cir. 1991) (regulations limit proceeding without a medical advisor and seem to presume that an ALJ has expert evaluation of mental impairment before him.); *Shields*, 801 F. Supp. at 159; 20 C.F.R. § 404.1520a(e)(3). *See also* 20 C.F.R. § 404.1519a(a)-(b) (ALJ may purchase consultative examination where evidence as a whole, including Plaintiff's allegations and disability interviews, is not sufficient to support a finding on the claim.). In other words, purchasing a consultative examination from psychiatrists and/or psychologists may be necessary. This is for the ALJ to decide on remand.

## 2. Combination of impairments

Plaintiff incorrectly states that, "The ALJ accepted that [Plaintiff] had a mental condition–depression–but denied that [Plaintiff's] depression was 'severe.'" (Pl.'s Br. at 10.) In his decision, the ALJ accepted Plaintiff's seizure disorder, but did not accept that Plaintiff suffers from a combination of impairments. While the ALJ describes Dr. Sucholeiki's questionnaire in his findings and concludes that, "severe mental impairment is not established . . ." (R. at 16), the ALJ never accepts that Plaintiff has a mental condition. In fact, the ALJ explicitly notes that there is no evidence in the record of Plaintiff ever complaining of, or seeking treatment for, a mental impairment. (R. at 16.) The ALJ also notes a complete lack of supporting evidence for Dr. Sucholeiki's notations on the Seizures Questionnaire. (Id.) Due to the apparent lack of evidence, any possible mental illness (including depression) would necessarily rate "not severe." On remand, however, the ALJ will have the opportunity to rate Plaintiff's mental impairments in accordance with the Commissioner's special technique and determine whether consideration of a combination of impairments is appropriate.

### E.    Non-Examiners

Plaintiff argues that the ALJ relied too heavily on non-examining state-agency physicians Drs. Ference and Pilapil. (Pl.'s Br. at 13.) Plaintiff suggests that the state-agency physicians are out of sync with Dr. Sucholeiki and cannot offer valuable insight because they did not review Dr. Sucholeiki's findings. (Id.)

State-agency physicians are highly qualified physicians who are experts at determining disability under the Social Security Act and an ALJ is ordinarily entitled to rely on them. *Scott v.*

*Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990); 20 C.F.R. § 404.1527(f)(2)(i). In this case, the state-agency physicians examined medical records submitted to them, (R. at 174-98), including records from Plaintiff's hospital, (R. at 182), and found Plaintiff not disabled. (R. at 181, 192, 198.) In addition, the ALJ found that uncontested evidence shows Plaintiff's medical condition improved steadily since July 2001. (R. at 17, 190, 208-09.) The only significant evidence the state-agency physicians did not examine, and the only evidence contradicting their opinion, is Dr. Sucholeiki's as yet unsupported Seizures Questionnaire. (R. at 189.)

As Plaintiff himself states, "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(d)(4). The ALJ's findings make clear that Dr. Sucholeiki, not the state-agency physicians, is out of sync with the record. Nonetheless, in order to properly weigh the medical evidence in this case, the ALJ must reconsult Dr. Sucholeiki. If Dr. Sucholeiki can support his opinions on stress and physical limitations, then the ALJ will have to reweigh the evidence from the state-agency physicians, as agency evaluations performed prior to important medical developments cannot constitute substantial medical evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995).

## V. **Conclusion**

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is

granted to the extent set out above and the Commissioner's motion for summary judgment is

denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: February 11, 2005.                    United States Magistrate Judge

Copies have been mailed to:

DANIEL BOURKE, Esq.
Law Offices of Daniel Bourke
407 South Dearborn Street
Suite 1235
Chicago, IL  60605

Attorney for Plaintiff

MS. MALINDA HAMANN
Special Assistant United States Attorney
200 West Adams Street
30th Floor
Chicago, IL  60606

Attorney for Defendant